IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TEXAS
AUSTIN DIVISION

| | | |
|---|---|---|
| MEYER, LYTTON, ALLEN, WHITAKER, INC. D/B/A MLAW ENGINEERS, | § § § | |
| *Plaintiff*, | § § | |
| *v.* | § § | No. 1:17-cv-00910 |
| COPELAND ENGINGEERING, LLC; CHRISTOPHER COPELAND; MERIDETH COPELAND; AARON WEAVER; RALPH GASTON; KELSON TREUHARDT; OSCAR CHAPARRO; & EFREN TAVIRA, | § § § § § § § § | (JURY TRIAL REQUESTED) |
| *Defendants*. | § | |

**PLAINTIFF'S ORIGINAL VERIFIED
COMPLAINT AND REQUEST FOR INJUNCTIVE RELIEF**

COMES NOW Meyer, Lytton, Allen, Whitaker, Inc. d/b/a MLAW Engineers, Plaintiff ("MLAW"), by and through its attorneys, and files this *Original Verified Complaint and Request for Injunctive Relief* against corporate Defendant Copeland Engineering, LLC and individual Defendants Christopher Copeland, Merideth Copeland, Aaron Weaver, Ralph Gaston, Kelson Treuhardt, Oscar Chaparro, and Efren Tavira, and in support thereof respectfully alleges and shows the Court as follows:

## I.   THE PARTIES

1.      MLAW is a Texas corporation in good standing and is authorized to do business in Texas. MLAW's principal place of business is located in Austin, Texas. MLAW is a full-service residential and light commercial structural engineering & inspections firm that provides professional services throughout south and central Texas, Louisiana, and Arkansas.

2.      Defendant Copeland Engineering is a Texas Limited Liability Company with a principal place of business at 1120 Cottonwood Creek Trail, Suite 180A, Cedar Park, Texas 78613. It may be served with process through its registered agent Christopher S. Copeland at 1120 Cottonwood Creek Trail, Suite 180A, Cedar Park, Texas 78613.

3.      Defendant Christopher Copeland is a natural person who, upon information and belief, resides at his home at 14412 Homestead Village Circle, Austin, Texas 78717.  He may be served at 1120 Cottonwood Creek Trail, Suite 180A, Cedar Park, Texas 78613.

4.      Defendant Merideth Copeland is a natural person who, upon information and belief, resides at her home at 14412 Homestead Village Circle, Austin, Texas 78717.  She may be served at 1120 Cottonwood Creek Trail, Suite 180A, Cedar Park, Texas 78613.

5.      Defendant Aaron Weaver is a natural person who, upon information and belief, resides at his home at 6509 Woodcrest Drive, Austin, Texas 78759.  He may be served at 1120 Cottonwood Creek Trail, Suite 180A, Cedar Park, Texas 78613.

6.      Defendant Ralph Gaston is a natural person who, upon information and belief, resides at his home at 8535 Alvin High Lane, Austin, Texas 78729.  He may be served at 1120 Cottonwood Creek Trail, Suite 180A, Cedar Park, Texas 78613.

7.      Defendant Kelson Treuhardt is a natural person who, upon information and belief, resides at his home at 14712 Springs Edge Drive, Austin, Texas 78717.  He may be served at 1120 Cottonwood Creek Trail, Suite 180A, Cedar Park, Texas 78613.

8.      Defendant Oscar Chaparro is a natural person who, upon information and belief, resides at his home at 3233 Elizabeth Anne Lane, Round Rock, Texas 78664.  He may be served at 1120 Cottonwood Creek Trail, Suite 180A, Cedar Park, Texas 78613.

9. Defendant Efren Tavira is a natural person who, upon information and belief, resides at his home at 5604 Southwest Parkway, Apt. 1833, Austin, Texas 78735. He may be served at 1120 Cottonwood Creek Trail, Suite 180A, Cedar Park, Texas 78613.

## II. JURISDICTION AND VENUE

10. This Court has jurisdiction over this action pursuant to 28 U.S.C. §§ 1331 and 1367, because the Verified Complaint alleges claims arising under the laws of the United States, and because all other claims alleged herein are so related to the claims alleged under federal law as to form part of the same case or controversy under Article III of the United States Constitution.

11. The United States District Court for the Western District of Texas, Austin Division, is the proper venue for this lawsuit, pursuant to 28 U.S.C. § 1391(a) and (b), because MLAW has a principal place of business in this judicial district, a majority of the Defendants reside within this judicial district, and because all or a substantial part of the events or omissions giving rise to the claims alleged in this Verified Complaint occurred within Austin, Travis County, Texas.

## III. FACTUAL BACKGROUND

### A. MLAW's Business Operations

12. MLAW is engaged in the business of residential and light commercial structural engineering and inspections focused primarily on foundation and framing design, inspection services, energy audits, forensic engineering analyses, and other structural engineering and design services.

13. MLAW provides these services to clients in a variety of markets, including custom home and volume builders, individual home owners, and individual and group commercial investors.

**B.      Christopher Copeland is Employed by MLAW, Receives the MLAW Company Handbook, Executes a Stock Purchase Agreement, and Executes a Non-Disclosure of Information Agreement.**

14.      Defendant Christopher Copeland ("Copeland") began his employment with MLAW as a Drafter on March 22, 1996. Over the course of his employment with MLAW, Defendant Copeland held numerous titles and continuously increased his responsibilities and authority as his career progressed. On March 4, 2016, when he suddenly resigned from MLAW, Defendant Copeland held the title of Interim Chief Financial Officer and Vice President of Engineering. At the time of his resignation, Defendant Copeland was a Partner, Shareholder, Officer, and Board Member of MLAW.

15.      As Interim Chief Financial Officer, Defendant Copeland was the corporate officer primarily responsible for: hiring, firing, and managing MLAW's personnel; managing financial risks; maintaining appropriate business controls; performing financial planning and financial and personnel record-keeping; and preparing financial reporting and cash flow management. In his role as interim CFO, he was specifically responsible for oversight of the controller, accounting teams, and human resources, and responsible for the administration of payroll and MLAW's 401K plan. As an officer of MLAW, Defendant Copeland had a fiduciary duty to use his uncorrupted business judgment for the sole benefit of MLAW with undivided loyalty and in the utmost good faith.

16.      As the Vice President of Engineering, Defendant Copeland was responsible for: the hiring, firing, development, support, and protection of MLAW's human capital; the execution and maintenance of mandatory documents in personnel files; and the protection of MLAW's intellectual property and trade secrets. He also maintained general oversight of MLAW's engineering activities to ensure compliance with structural guidelines, structural safety, and client preferences. He also met with existing clients to ensure client expectations on product

quality, timeliness, pricing, and preferences were met; and he actively pursued new business for MLAW in both a lead and support capacity.

17.     Defendant Copeland was named a Partner/Shareholder and a voting member of the Board of Directors on January 1, 2004. As a Partner/Shareholder, Defendant Copeland maintained fiduciary obligations to MLAW and MLAW's employees and was required to place the interests of MLAW ahead of his own, including but not limited to, protecting the company's tangible and intangible assets. Defendant Copeland was an active member of the Board of Directors and was privy to highly confidential financial information and strategic initiatives, including MLAW's proprietary research and development.

18.     To perform the functions of his various roles, Defendant Copeland attended and participated in MLAW sales, engineering, and innovation sessions; attended partnership and board meetings; visited with potential and existing clients, either in person or via telephone, email, or text; engaged in significant engineering design, oversight, and project management; and actively explored diversified investment opportunities and research and development strategies. Defendant Copeland also assisted other MLAW employees and partners with business opportunities for a number of MLAW potential and existing clients.

19.     To enable Defendant Copeland to effectively perform these essential functions of his various roles as an Employee, Manager, Officer, Shareholder, and Member of MLAW's Board of Directors, MLAW afforded him access to a wealth of MLAW's proprietary, non-publicly-available business information including, among other things, financial statements, strategic initiatives, research and development projects, proprietary software and tools, client lists, strategic partner contacts and pricing, client data, client preferences, client plans, plan templates, marketing strategies and data, client proposals and drafts thereof, confidential pricing

information for MLAW's current and potential clients, proprietary source code, and other valuable trade secrets (collectively, MLAW's "Confidential Information"). MLAW also issued Defendant Copeland a secure, password-protected computer and various mobile devices with secured individual profiles and access to proprietary server files as a means to access this Confidential Information, which is securely stored on MLAW's systems and not otherwise accessible by proper means.

20.     MLAW's Confidential Information is not known to, and is not readily ascertainable by lawful or proper means by, MLAW's competitors in the market. Such Confidential Information derives substantial independent economic value from its secrecy; value that benefits MLAW and would be destroyed if MLAW's competitors or others in the market were able to obtain it.

21.     In order to protect and ensure the continued secrecy and value of its Confidential Information, as a condition of his employment, MLAW required Defendant Copeland to review and acknowledge receipt of MLAW's Company Handbook.

22.     On April 19, 1996, and again on August 14, 1997, and June 8, 2004, Defendant Copeland acknowledged receiving the MLAW Company Handbook and revisions thereof which contained policies governing his employment with MLAW. Each of the MLAW Company Handbooks Defendant Copeland acknowledged receiving contained some form of the following provisions:

- "Employees are prohibited from the unauthorized use of the passwords and encryption keys of other employees to gain access to the other employee's email messages."

- "Employees are . . . prohibited from unauthorized copying or transmission of copyrighted files . . ."

- "Your time outside office hours is your own. However, you may not undertake work which may be in competition or conflict with this Company or which may interfere with the proper execution of your responsibilities. Anyone working for this firm should not work for another engineering or architectural firm, government office, or contractor."

True and correct copies of Defendant Copeland's Handbook Receipt Acknowledgements are attached as **Exhibit 1**.

23.     In order to further protect and ensure the continued secrecy and value of its Confidential Information, MLAW required Defendant Copeland to execute and comply with a Non-Disclosure of Information and Assignments Agreement (the "Non-Disclosure Agreement"). On October 7, 2015, Defendant Copeland executed the Non-Disclosure Agreement. The Non-Disclosure Agreement contained the following provisions:

- "All inventions ideas, and discoveries, whether or not patentable, conceived, or made by me, which relate to or constitute improvements on the Company's existing or contemplated products, components, ingredients, intermediates, formulae or data, or apparatuses, processes, techniques, or procedures employed in the production of same, or any improvements thereof, shall become the exclusive property of the Company."

- "I will hold in secret, and not divulge private and proprietary information trade secrets, and know-how of both the Company and all client proprietary information disclosed to the Company, which I may learn or comes into my possession."

A true and correct copy of Defendant Copeland's executed Non-Disclosure Agreement is attached as **Exhibit 2**.

24.     In addition to these promises, Defendant Copeland also represented, by acknowledging receipt of the Company Handbook, that upon the termination of his employment with MLAW, Defendant Copeland would "return all company property." Such property included: any company vehicles, keys, credit cards, mobile devices, files, records, reports, storage devices containing company files or records, handbooks, manuals, code books, equipment, final timesheets, and expense reports.

25.   When Defendant Copeland was named a Partner/Shareholder, he executed a Stock Purchase Agreement. Among other relevant provisions, the Stock Purchase Agreements contains the following provision:

- In the event of the voluntary or involuntary withdrawal of an active employee Shareholder of the Company, the Selling Shareholder will receive one hundred percent (100%) of the Fair Market Value of the Shares owned by him just prior to the date of withdrawal. The purchase price for the Shares will be paid by the Company within a period not to exceed twelve (12) years in one hundred forty-four (144) equal monthly installments, including interest at the Prime Bank Lending Rate (per Section 1.8) existing at the Date of Withdrawal (Section 1.2) minus two (2) percentage points; provided, however, if the monthly installments so calculated exceed one-half (1/2) of the last monthly salary paid to the Selling Shareholder by the Company, then in such event, the 144 monthly installments shall be in the amount of one-half (1/2) of the last monthly salary paid to the Selling Shareholder. In such event the remaining unpaid balance owing to the Selling Shareholder will be paid in the 144th month. **If within twenty-four (24) months of the date of withdrawal the Selling Shareholder engages in the practice of civil, forensic, or structural engineering; foundation design or inspections; or marketing, management or consulting with an organization providing similar services as the Company, within a geographic location inside a 100 mile radius from any MLAW office, or if within said period he/she engages in the practice of civil, forensic, or structural engineering; or foundation design or inspections; for any current client of the Company (or former client whose work was done within the last thirty-six (36) months), other than in accordance with a specific agreement reached with the Company and approved by the Board of Directors, then in such event the payment for shares will be reduced to seventy percent (70%) of the most recent Fair Market Value or the amount paid for the Shares, whichever is more.**

(Emphasis added.)

26.   The express terms of this Stock Purchase Agreement provision provide a significant reduction of the fair market value of an outgoing shareholder's shares if that shareholder engages in competitive activities within twenty-four months of separation from MLAW. This provision acts as a non-competition covenant designed to protect MLAW's legitimate proprietary business interests and to deter shareholders from engaging in competitive activity in breach of their fiduciary duties to MLAW.

27.     Defendant Copeland's promises to protect MLAW's Confidential Information in the Company Handbook and the Non-Disclosure Agreement were essential conditions to MLAW offering him employment, and sharing with him the Confidential Information he needed to perform his job at MLAW. Moreover, the provision of the Stock Purchase Agreement that imposes a penalty for engaging in competitive activity upon separation was an essential condition to MLAW offering Defendant Copeland a Partner/Shareholder position and was designed specifically to protect and keep secure MLAW's Confidential Information. Most importantly, Defendant Copeland's position as an officer required that he maintain only the highest ethical and fiduciary duties to the company.

## C.     Defendant Copeland Suddenly Resigns from MLAW and Begins Engaging in Unlawful Conduct That Violates His Agreement with and Legal Duties to MLAW.

28.     On March 4, 2016, Defendant Copeland suddenly and without notice resigned via email to his fellow shareholders after surreptitiously emptying his office and deleting all information from his MLAW issued phone and computer, using a factory reset to wipe both devices. A true and correct copy of Defendant Copeland's Resignation Letter and accompanying email are attached as **Exhibit 3**.

29.     During a post-separation investigation by MLAW, it was uncovered that in the months leading up to his resignation, Defendant Copeland was extremely busy secretly gathering MLAW's Confidential Information (including client lists, data & pricing, key employee compensation and MLAW financial information and internal documents) and copying, transmitting, or otherwise saving that information to personal, non-MLAW devices and email accounts. Defendant Copeland never sought permission from anyone at MLAW to engage in this conduct, and never would have been granted permission to do so had he asked.

30.    Defendant Copeland was appointed interim Chief Financial Officer of MLAW on January 15, 2016, when he published and distributed a Press Release announcing his new role. The CFO position had not formally existed at MLAW prior to that time and Defendant Copeland himself requested the appointment. At the time of his appointment, Defendant Copeland maintained no specific financial, business, or accountancy degrees, but rather convinced his fellow shareholders that he would be right for a CFO position because he cared about MLAW's financial health and well-being and wanted to see MLAW be successful.

31.    Post-separation forensics revealed that on January 7, 2016—prior to the formal announcement of his CFO position—Defendant Copeland began using the email "CFO@mlaw-eng.com." On that same day, Defendant Copeland backed up the contents of his MLAW phone to store and retain MLAW company records and data on a non-MLAW issued computer.

32.    Contrary to his expressed sentiments about having MLAW's best interests in mind, public records reveal that on January 15, 2016—the same day that he announced his new CFO position—Defendant Copeland registered for the URL www.copeland-eng.com, the URL for his now-operating competitive company. A true and correct copy of the URL registration is attached as **Exhibit 4**. On that same day, computer records reveal that Defendant Copeland created a note file on his MLAW computer with a series of tasks required to setup a new engineering firm to directly compete with MLAW without notice. Subsequently, just 6 days after taking the CFO position, Defendant Copeland filed to open the Limited Liability Company "Copeland Engineering" with the Texas Secretary of State. A true and correct copy of the Certification of Formation for Copeland Engineering is attached as **Exhibit 5**. And on March 4, 2016—the day that Defendant Copeland resigned—Copeland Engineering received licensing to do business from the Texas Board of Professional Engineers, revealing that an application had

been recently submitted. A true and correct copy of Copeland Engineering's licensing certification is attached as **Exhibit 6**. There can be no dispute that Defendant Copeland was acting for his own self-interests rather than for MLAW's benefit when he took the CFO position.

33.     The CFO position gave Defendant Copeland access to all of MLAW's internal financial data, client lists, service pricing information, employee salary data, personnel files, and other confidential historical economic information. For an individual preparing to directly compete with MLAW and directly solicit MLAW's human capital, such unfettered access to MLAW's financial information was invaluable. Defendant Copeland's improper access to and unauthorized use of such information in order to gain a competitive advantage over MLAW constitutes an utter disregard for his legal and fiduciary obligations to MLAW.

34.     In or about early February 2016, Defendant Copeland approached MLAW's Human Resource Director to inquire about the status of Educational Aid Agreements for MLAW employees Ralph Gaston and Kelson Treuhardt. As Vice President of Engineering, Defendant Copeland was directly responsible for ensuring each employee properly executed his Employee Handbook Acknowledgement, Employee Agreement, Non-Disclosure and Assignment Agreement, and Educational Aid Agreement. Further, Defendant Copeland was directly responsible for ensuring that Educational Aid Agreements were signed prior to releasing any tuition reimbursements or paying any employee compensation while that employee attended school. As CFO, Defendant Copeland was also directly responsible for rectifying any missing or unsigned Educational Aid Agreements. As discussed further below, despite requesting such information from the HR Director, Defendant Copeland failed to ensure that Ralph Gaston and Kelson Treuhardt had properly executed Educational Aid Agreements and related documents in their personnel files. Defendants Gaston and Treuhardt's subsequent transition to working at

Copeland Engineering suggests that Defendant Copeland intentionally disregarded his obligation to ensure both employees executed and complied with the terms of their respective Educational Aid Agreements.

35.     MLAW's post-separation investigations further revealed that shortly after registering his new venture and while still employed with MLAW as an officer and shareholder, on February 7, 2016, Defendant Copeland began forwarding all incoming MLAW calls on his mobile device to a new number unaffiliated with MLAW. There was no valid business reason for Defendant Copeland to forward MLAW calls to an alternate, non-MLAW phone number. Further investigation revealed that the alternate number to which these calls were forwarded is now the main contact number for Copeland Engineering. There can be no dispute that Defendant Copeland forwarded MLAW calls to his alternate number, while still employed with MLAW, to divert MLAW business and gather confidential and proprietary information from existing MLAW clients, vendors, strategic partners and employees in violation of his contractual, legal, and fiduciary obligations to MLAW.

36.     Moreover, as post-separation investigations reveal, in the months leading up to his resignation, Defendant Copeland breached his duty to keep secure MLAW's confidential and proprietary information and used MLAW's resources to start up his next venture by, among other things, forwarding proprietary and confidential company emails to two personal email addresses—"chriscopeland71@att.net" and "meridethcopeland@att.net." Upon information and belief, the second email address belongs to Defendant Copeland's wife Merideth Copeland, a Member/Manager and the founding CFO of Copeland Engineering. These email communications included confidential information pertaining to MLAW including but not limited to: financials, company insurance coverage, ongoing legal action updates, employee performance reports,

investment information, internal meeting notes, client contact information, client project information, and other internal company information. At all times when he engaged in this conduct, Defendant Copeland remained a MLAW employee, officer, and shareholder, who had access to MLAW's Confidential Information solely because of his high level position. Defendant Copeland never sought permission from anyone at MLAW to use MLAW resources to start-up and to double-deal with a competitor company nor to send internal MLAW information to non-MLAW employees, and never would have been granted permission to do so had he asked.

37.     In the days and weeks immediately following his resignation from MLAW, Defendant Copeland further violated his promises and legal duties to MLAW by directly soliciting MLAW's employees who were highly trained by MLAW and whom constituted significant human capital that directly contributed to the valuation and performance of MLAW and serviced its most valued clients. Defendant Copeland directly solicited and hired Aaron Weaver, Ralph Gaston, Kelson Treuhardt, Oscar Chaparro, Garry Edwards, Jen Soliz, and Efren Tavira. As discussed below, forensic discovery performed on many of these former employee's computers and devices revealed that like Defendant Copeland, they too gathered proprietary information and downloaded MLAW's internal company and client files for use at Copeland Engineering.

**D.     Aaron Weaver is Employed by MLAW, Receives the MLAW Company Handbook, and Executes a Non-Disclosure of Information Agreement.**

38.     Defendant Aaron Weaver ("Weaver") began his employment with MLAW as an Inspector on September 10, 2004. Over the course of his employment with MLAW, Defendant Weaver held numerous titles and continuously increased his responsibilities and authority as MLAW continued to invest in his professional growth. On April 1, 2016, when he resigned, he held the title of Corporate Systems Analyst and Inspection Manager.

39.     As Corporate Systems Analyst, Defendant Weaver was responsible for, among his other job duties, gathering information, reviewing internal processes, and implementing controls and changes in order to optimize MLAW's operational efficiencies. This position gave Defendant Weaver access to all MLAW operational data, internal processes and systems, and client files.

40.     As Inspection Manager, Defendant Weaver was responsible for: hiring, firing, developing, supporting, and protecting MLAW's human capital; the execution and maintenance of mandatory documents in personnel files; the general scheduling and oversight of inspection activities to ensure compliance with structural guidelines, structural safety, and client preferences; maintaining appropriate documentation and completing review of client inspection reports; timely invoicing clients and releasing associated compliance letters; and meeting with existing clients to ensure client expectations on product quality, timeliness, and pricing issues were fully met.

41.     These positions gave Defendant Weaver access to MLAW's financial statements, strategic initiatives, research and development projects, proprietary software and tools, client lists, strategic partner contacts and pricing, client data, client preferences, client plans, plan templates, marketing strategies and data, client proposals and drafts thereof, confidential pricing information for current and potential clients, proprietary source code, and other valuable trade secrets (collectively, MLAW's "Confidential Information").

42.     To perform the functions of his various roles, Defendant Weaver attended MLAW management meetings, visited with potential clients (either in person, via email, and/or telephone); and engaged in significant analysis of overall operations at MLAW for the

inspection, framing, and foundation departments. Defendant Weaver also assisted other MLAW employees and partners with servicing a number of MLAW existing clients.

43.     To enable Defendant Weaver to effectively perform these essential functions of his various roles, MLAW afforded him access to a wealth of MLAW's Confidential Information as described above. MLAW also issued Defendant Weaver a secure, password-protected computer as a means to access this Confidential Information, which is securely stored on MLAW's systems and not otherwise accessible by proper means.

44.     In order to protect and ensure the continued secrecy and value of its Confidential Information, as a condition of his employment, MLAW required Defendant Weaver to review and acknowledge receipt of MLAW's Company Handbook.

45.     On September 14, 2004, and August 8, 2006, Defendant Weaver acknowledged receiving the MLAW Company Handbook and revisions thereof which contained policies governing his employment with MLAW. Each of the MLAW Company Handbook revisions Defendant Weaver acknowledged receiving contained some form of the following provisions:

- "Employees are prohibited from the unauthorized use of the passwords and encryption keys of other employees to gain access to the other employee's email messages."

- "Employees are  .  .  .  prohibited from unauthorized copying or transmission of copyrighted files . . ."

- "Your time outside office hours is your own. However, you may not undertake work which may be in competition or conflict with this Company or which may interfere with the proper execution of your responsibilities. Anyone working for this firm should not work for another engineering or architectural firm, government office, or contractor."

True and correct copies of Defendant Weaver's Handbook Receipt Acknowledgements are attached as **Exhibit 7**.

46.     In order to further protect and ensure the continued secrecy and value of its Confidential Information, MLAW required Defendant Weaver to execute and comply with a Non-Disclosure of Information and Assignments Agreement (the "Non-Disclosure Agreement"). On October 6, 2015, Defendant Weaver executed the Non-Disclosure Agreement. The Non-Disclosure Agreement contained the following provisions:

- "All inventions ideas, and discoveries, whether or not patentable, conceived, or made by me, which relate to or constitute improvements on the Company's existing or contemplated products, components, ingredients, intermediates, formulae or data, or apparatuses, processes, techniques, or procedures employed in the production of same, or any improvements thereof, shall become the exclusive property of the Company."

- "I will hold in secret, and not divulge private and proprietary information trade secrets, and know-how of both the Company and all client proprietary information disclosed to the Company, which I may learn or comes into my possession."

A true and correct copy of Defendant Weaver's Non-Disclosure Agreement is attached as **Exhibit 8**.

47.     In addition to these promises, Defendant Weaver also represented, by acknowledging receipt of the Company Handbook, that upon the termination of his employment with MLAW, he would "return all company property," including but not limited to, any company vehicles, keys, credit cards, mobile devices, files, records, reports, storage devices containing company files or records, handbooks, manuals, code books, equipment, final timesheets and expense reports.

48.     Defendant Weaver's promises to protect MLAW's Confidential Information were essential conditions to MLAW offering him employment, and sharing with him the Confidential Information he needed to perform his job at MLAW and were designed specifically to protect and keep secure MLAW's Confidential Information.

E.  **Aaron Weaver Misappropriates MLAW Confidential Information and Suddenly Resigns from MLAW, Violating His Agreements and Legal Duties to MLAW.**

49.  On April 1, 2016, Defendant Weaver suddenly resigned from MLAW. His resignation letter stated that he was starting his own home inspection business, but MLAW quickly learned that Defendant Weaver in fact left MLAW to join Copeland Engineering as Vice President of Operations.

50.  As was uncovered during post-separation investigation by MLAW, in the months leading up to his resignation, Defendant Weaver was extremely busy secretly gathering MLAW's Confidential Information and internal documents. Records show Defendant Weaver sent confidential data from his MLAW email address—"ajweaver@mlaw-eng.com"—to two non-MLAW personal e-mail addresses—"aarroon@gmail.com" and "aaron@builcodepro.com." Such emailed data included but was not limited to, MLAW confidential and proprietary client lists, forms, legal disclosures, client plans, and other client-related information. Forensic review of Defendant Weaver's MLAW-issued computer revealed substantial downloads of confidential and proprietary information to external devices dating back as far as 2014 and 2015 and continuing through his sudden departure from MLAW.

51.  In addition, MLAW's phone records for March 2016 for Defendant Weaver's MLAW-issued mobile phone revealed that he was actively engaged in communications with Copeland Engineering beginning March 4, 2016. Those communications increased significantly as Defendant Weaver's impending departure approached (and a direct correlation with the download of proprietary information from MLAW's secure systems is reflected in the forensic records). Nearly a third of Defendant Weaver's total voice usage for March 2016 was dedicated to direct phone calls with Copeland Engineering. His immediately subsequent employment with Copeland Engineering post-resignation reveals that such phone communications were anything

but innocuous. Defendant Weaver never sought permission from anyone at MLAW to engage in this conduct, and never would have been granted permission to do so had he asked.

**F.      Ralph Gaston is Employed by MLAW, Receives the MLAW Company Handbook, and Executes an Educational Aid Agreement.**

52.     Defendant Ralph Gaston ("Gaston") began his employment with MLAW as a Drafter on May 3, 2000. Like the other Defendants, over the course of his employment with MLAW Defendant Gaston held numerous titles and continuously increased his responsibilities and authority as MLAW continued to invest in his professional growth.

53.     As a Drafter, Defendant Gaston was responsible for designing structural plans for MLAW clients. This position gave Defendant Gaston access to MLAW proprietary processes, tools, and client information.

54.     At the time of his resignation on April 15, 2016, Defendant Gaston held the title of Framing Manager/Engineer. As a Framing Manager/Engineer, Defendant Gaston was responsible for:  hiring, firing, developing, supporting, and protecting MLAW's human capital; the maintenance of mandatory documents in personnel files; the development and protection of MLAW's intellectual property and trade secrets; the general oversight of framing department activities to ensure compliance with structural guidelines, structural safety, and client preferences; ensuring client expectations on product quality, timeliness, pricing, and client preferences were met; and supporting existing and pursuing new business for MLAW.

55.     As a Framing Manager, Defendant Gaston had access to MLAW's financial statements; strategic initiatives; research and development projects; proprietary software and tools; client lists; strategic partner contacts and pricing; client data; plan templates; marketing strategies; confidential pricing information for MLAW's current and potential clients; proprietary

source code; and other valuable trade secrets (collectively, MLAW's "Confidential Information" as previously described).

56.     To perform the functions of his various roles, Defendant Gaston attended MLAW sales and engineering meetings; visited with potential clients, either in person or via telephone; and engaged in significant engineering design, inspection, and project management. Defendant Gaston also assisted other MLAW employees and partners with business opportunities for a number of existing MLAW clients.

57.     To enable Defendant Gaston to effectively perform these essential functions of his various roles, MLAW afforded him access to a wealth of MLAW's Confidential Information as described above. MLAW also issued Defendant Gaston a secure, password-protected computer to access this Confidential Information, which is securely stored on MLAW's systems and not otherwise accessible by proper means.

58.     In order to protect and ensure the continued secrecy and value of its Confidential Information, as a condition of his employment, MLAW required Defendant Gaston to review and acknowledge receipt of MLAW's Company Handbook.

59.     Like the other Defendants, Defendant Gaston acknowledged receiving the MLAW Company Handbook and revisions thereof, which contained policies governing his employment with MLAW[1].

60.     In or about early 2011, Defendant Gaston requested reimbursement for, and MLAW agreed to reimburse Defendant Gaston for, educational expenses related to his pursuit of a professional engineering degree in structural engineering. The agreement was to be retroactive to take effect with his first course of study on December 3, 2006. MLAW agreed to pay

---

[1]     Despite thorough and consistent employee record keeping, Defendant Gaston's employee file is missing all company handbook revision acknowledgements. As previously noted, it was Defendant Copeland's responsibility to ensure that Defendant Gaston's personnel file contained the appropriate and necessary forms.

Defendant Gaston's tuition and fees in exchange for Defendant Gaston agreeing to remain employed with MLAW on a full-time basis for a minimum of eight (8) years following the completion of his course of study. In addition, Defendant Gaston agreed to execute a loan payment promissory note at the completion of his course of study for the full amount incurred by MLAW for Defendant Gaston's education. The promissory note would be deemed partially satisfied every year following Defendant Gaston's completion of his course of study, but if Defendant Gaston were to separate from MLAW before his eight (8) year commitment was up, Defendant Gaston would owe MLAW a pro-rated percentage of his education expenses. A true and correct copy of Defendant Gaston's Educational Aid Agreement is attached as **Exhibit 9**[2].

### G.   Ralph Gaston Misappropriates MLAW Confidential Information and Suddenly Resigns from MLAW, Violating His Agreements and Legal Duties to MLAW.

61.    On April 15, 2016, Defendant Gaston suddenly resigned from MLAW. While his resignation letter suggested that he would be willing to reimburse MLAW for his educational expenses per his Educational Aid Agreement no such repayment has been forthcoming.

62.    Moreover, in his resignation letter, Defendant Gaston specifically highlighted the proprietary intellectual property and trade secrets he had created while employed with MLAW and acknowledged the advanced education afforded to him by MLAW. A true and correct copy of Defendant Gaston's Resignation Letter is attached as **Exhibit 10.**

63.    Defendant Gaston stated in his resignation letter, "I will be available at your request for the next two-week period to come in to the office under your direction so that I will have only limited supervised access to the existing infrastructure." A post-separation investigation by MLAW revealed, however, that in the months leading up to his resignation,

---

[2]    Like his Handbook Receipt Acknowledgements, Defendant Gaston's Educational Aid Agreement was missing from his personnel file. A copy was recovered from a backup location. As previously noted, it was Defendant Copeland's responsibility to ensure that Defendant Gaston's personnel file contained the appropriate and necessary forms.

Defendant Gaston was extremely busy secretly gathering MLAW's Confidential Information and internal documents and transferring that confidential data from his MLAW password-secured computer to personal external storage devices. Defendant Gaston was likewise colluding with Copeland Engineering to steal MLAWs proprietary and confidential information.

64.     Specifically, forensic reviews of Defendant Gaston's MLAW-issued computer and secure user profile showed that from about March 10, 2016, up to his departure on April 15, 2016, he downloaded proprietary and confidential MLAW files to external USB devices and/or external cloud-based storage locations. On May 11, 2016, nearly one month *after* his official separation from MLAW, while at MLAW performing transition training, Defendant Gaston again improperly accessed and downloaded proprietary and confidential files to external USB devices and/or external cloud-based storage locations. In all, the proprietary and confidential files Defendant Gaston downloaded constituted a significant portion (terabytes) of MLAW's internal records, including but not limited to client plans, master plans, software tools, internal process documents, source code, and MLAW AutoCAD Licenses.

65.     In addition, MLAW's phone records for March and April 2016 for Defendant Gaston's company issued mobile phone revealed that he was actively engaged in communication with Copeland Engineering beginning March 7, 2016. These communications increased significantly as Defendant Gaston's impending departure approached. Over 40% of his voice usage for the month of March 2016 were calls directly to Copeland Engineering. In April 2016, just prior to Defendant Gaston's departure, over 70% of his calls were directly to Copeland Engineering. There is no denying that these calls coincide directly with Defendant Gaston's massive downloads of MLAW Confidential Information.

66.     Defendant Gaston never sought permission from anyone at MLAW to engage in this conduct, and never would have been granted permission to do so had he asked.

**H.    Kelson Treuhardt is Employed by MLAW, Receives the MLAW Company Handbook, and Agrees to an Educational Aid Agreement [and Executes a Non-Disclosure of Information Agreement].**

67.     Defendant Kelson Treuhardt ("Treuhardt") began his employment with MLAW as a Drafter on October 24, 2005. Over the course of his employment with MLAW, Defendant Treuhardt held numerous titles and continuously increased his responsibilities and authority as MLAW continued to invest in his professional growth. On May 20, 2016, when he resigned from MLAW, he held the title of Framing Manager.

68.     As a Framing Manager, Defendant Treuhardt was responsible for: hiring, firing, developing, supporting, and protecting MLAW's human capital, maintaining mandatory documents in personnel files; developing and protecting MLAW's intellectual property and trade secrets; general oversight of framing department activities to ensure compliance with structural guidelines, structural safety, and client preferences; ensuring client expectations on product quality, timeliness, pricing, and preferences were met; and supporting existing and pursuing new business for MLAW.

69.     To perform the functions of his various roles, Defendant Treuhardt attended MLAW sales and engineering meetings; visited with potential clients, either in person or via telephone; and engaged in significant engineering design, inspection, and project management. He also assisted other MLAW employees and partners with business opportunities for a number of MLAW existing clients.

70.     This position gave Defendant Treuhardt access to MLAW's Confidential Information as defined above.

71.     To protect and ensure the continued secrecy and value of its Confidential Information, as a condition of his employment, MLAW required Defendant Treuhardt to review and acknowledge receipt of MLAW's Company Handbook.

72.     On August 4, 2006, Defendant Treuhardt acknowledged receiving the MLAW Company Handbook which contained policies governing his employment with MLAW. The Handbook contained the some form of the following provisions:

- "Employees are prohibited from the unauthorized use of the passwords and encryption keys of other employees to gain access to the other employee's email messages."

- "Employees are . . . prohibited from unauthorized copying or transmission of copyrighted files . . ."

- "Your time outside office hours is your own. However, you may not undertake work which may be in competition or conflict with this Company or which may interfere with the proper execution of your responsibilities. Anyone working for this firm should not work for another engineering or architectural firm, government office, or contractor."

A true and correct copy of Defendant Treuhardt's Handbook Receipt Acknowledgement is attached as **Exhibit 11.**

73.     In or about September 2013 Defendant Treuhardt requested, and MLAW agreed, to reimburse Defendant Treuhardt for educational expenses related to his pursuit of an Engineering degree.  MLAW agreed to pay Defendant Treuhardt's tuition and fees in exchange for Defendant Treuhardt's agreement to remain employed with MLAW on a full-time basis for a minimum number of years. In addition, Defendant Treuhardt agreed to execute a loan payment promissory note at the completion of his course of study for the full amount incurred by MLAW for Defendant Treuhardt's education. The promissory note would be deemed partially satisfied every year following Defendant Treuhardt's completion of his course of study, but if Defendant

Treuhardt were to separate from MLAW before his commitment was up, Defendant Treuhardt would owe MLAW a prorated percentage of his education expenses.

74. Defendant Copeland was responsible for ensuring that Defendant Treuhardt executed the proper educational aid agreement to memorialize the tuition reimbursement arrangement. At the time of Defendant Copeland's resignation from MLAW, Defendant Copeland had failed to receive Defendant Treuhardt's signed agreement. In early April 2016, MLAW's then Controller, Janet Havelka, had an email exchange with Defendant Treuhardt in which she requested, and Defendant Treuhardt promised to execute, a proper educational aid agreement. Despite Defendant Treuhardt's repeated promises to sign the agreement, Defendant Treuhardt repeatedly and intentionally failed to meet with Ms. Havelka in order to execute the document.

75. MLAW's records reveal that MLAW paid over $33,600 in tuition and expenses for Defendant Treuhardt's education. MLAW would not have made such payments without Defendant Treuhardt's express promise that MLAW would benefit from Defendant Treuhardt's education and without the express promise that Defendant Treuhardt would remain employed with MLAW for a set amount of time or otherwise reimburse MLAW should he separate from employment prior to the expiration of that promised continued employment commitment.

76. To date, Defendant Treuhardt has failed to repay any portion of the educational expenses from which he benefited.

## I. Kelson Treuhardt Misappropriates MLAW Confidential Information and Suddenly Resigns from MLAW, Violating His Agreements and Legal Duties to MLAW.

77. On May 20, 2016, Defendant Treuhardt suddenly resigned from MLAW. In his exit interview, Treuhardt stated that despite his prior agreement and promises, he would not be executing an Educational Aid Agreement or repaying the monies provided him. Notably, a post-

separation review of Defendant Treuhardt's MLAW email revealed that Defendant Treuhardt emailed to his personal email address various emails in which Ms. Havelka had requested Defendant Treuhardt execute an educational aid agreement and memorialize his promises to repay MLAW for the educational expenses from which he benefited. There is no denying that Defendant Treuhardt was aware of the promise he had made to reimburse MLAW for his educational expenses; his refusal to execute a document memorializing that agreement was intentional.

78.     As was further uncovered during post-separation investigation by MLAW, in the months leading up to his resignation, Defendant Treuhardt was extremely busy secretly gathering MLAW's Confidential Information and internal documents and sending that confidential data to his personal e-mail account.  Records show that just prior to his resignation, Defendant Treuhardt emailed various MLAW Confidential Information from his MLAW email address—"ketreuhardt@mlaw-eng.com"—to a non-MLAW personal email address— "ktreuhardt@gmail.com." The emails and documents MLAW recovered show that Defendant Treuhardt emailed to himself, among other things, proprietary MLAW design and engineering files, internal private MLAW email correspondence, and other confidential MLAW business information. Defendant Treuhardt never sought permission from anyone at MLAW to engage in this conduct, and never would have been granted permission to do so had he asked.

**J.     Oscar Chaparro is Employed by MLAW, Receives the MLAW Company Handbook, and Executes a Non-Disclosure of Information Agreement.**

79.     Defendant Oscar Chaparro ("Chaparro") began his employment with MLAW as a Drafter on September 3, 2013. Over the course of Defendant Chaparro's employment with MLAW, the company continued to invest in his professional growth. As of his resignation on August 22, 2016, Defendant Chaparro held the title of Framing Designer.

80.     As a Framing Designer, Defendant Chaparro was responsible for designing framing plans for MLAW clients. This position gave Defendant Chaparro access to MLAW client plans, MLAW master plans, and MLAW proprietary tools, processes, and trade secrets.

81.     To perform the functions of his role, Defendant Chaparro attended MLAW engineering meetings; visited with MLAW clients, either in person or via telephone; and engaged in significant design, work. Defendant Chaparro also assisted other MLAW employees and partners with MLAW existing clients.

82.     To enable Defendant Chaparro to effectively perform these essential functions of his job, MLAW afforded him access to a wealth of MLAW's Confidential Information as described above. MLAW also issued Defendant Chaparro a secure, password-protected computer, as a means to access this Confidential Information, which is securely stored on MLAW's systems and not otherwise accessible by proper means.

83.     To protect and ensure the continued secrecy and value of its Confidential Information, as a condition of his employment, MLAW required Defendant Chaparro to review and acknowledge receipt of MLAW's Company Handbook.

84.     On September 3, 2013, Defendant Chaparro acknowledged receiving the MLAW Company Handbook which contained policies governing his employment with MLAW. The MLAW Company Handbook Defendant Chaparro acknowledged receiving contained some form of the following provisions:

- "Employees are prohibited from the unauthorized use of the passwords and encryption keys of other employees to gain access to the other employee's email messages."

- "Employees are . . . prohibited from unauthorized copying or transmission of copyrighted files . . ."

- "Your time outside office hours is your own. However, you may not undertake work which may be in competition or conflict with this Company or which may interfere with the proper execution of your responsibilities. Anyone working for this firm should not work for another engineering or architectural firm, government office, or contractor."

A true and correct copy of Defendant Chaparro's September 3, 2013, Company Handbook Receipt Acknowledgement is attached as **Exhibit 12**.

85.     Additionally, and in furtherance of protecting and ensuring the continued secrecy and value of its Confidential Information, as a condition of his employment, MLAW required Defendant Chaparro to execute an employment agreement which contained, among other things, a covenant not to compete with MLAW for a period of twelve (12) months following separation from MLAW. The restrictive covenant was reasonable, necessary, and limited in scope to protect MLAW's legitimate business interest. A true and correct copy of Defendant Chaparro's Employment Agreement is attached as **Exhibit 13**.

86.     Defendant Chaparro's promises to protect MLAW's Confidential Information and to not compete against MLAW for one year post-separation were essential conditions to MLAW offering him employment, investing in his training, and sharing with him the Confidential Information he needed to perform his job at MLAW.

**K.     Oscar Chaparro Suddenly Resigns from MLAW and Begins Engaging in Unlawful Conduct That Violates His Agreement with and Legal Duties to MLAW.**

87.     On September 2, 2016, Defendant Chaparro suddenly resigned from MLAW, readily acknowledging the training and guidance provided by MLAW to advance his professional skill and value while also immediately acting to violate his legal duties to MLAW.

88.     Upon information and belief, Defendant Chaparro promptly began working for Copeland Engineering performing duties identical to those performed at MLAW, openly sharing his knowledge of MLAW's Confidential Information with Copeland Engineering employees,

and in direct violation of the restrictive covenants to which he promised to abide in his MLAW employment agreement.

89.     Specifically, forensic reviews of Defendant Chaparro's MLAW-issued computer and secure user profile show that from about July 18, 2016 to his separation date, Defendant Chaparro downloaded proprietary and confidential files to external USB devices and/or external cloud-based storage locations.

90.     These proprietary and confidential files constituted a significant portion of MLAW internal records, including but not limited to MLAW client plans, MLAW master plans, MLAW tools, and MLAW internal process documents. Defendant Chaparro never sought permission from anyone at MLAW to engage in this conduct, and never would have been granted permission to do so had he asked.

**L.     Efren Tavira is Employed by MLAW, Receives the MLAW Company Handbook, and Executes a Non-Disclosure of Information Agreement.**

91.     Defendant Efren Tavira ("Tavira") began his employment with MLAW as a Drafter on February 12, 2015. Over the course of his employment with MLAW, MLAW continued to invest in his professional growth. As of February 13, 2017, when he resigned, Defendant Tavira held the title of Engineer in Training (EIT).

92.     As a Drafter and EIT, Defendant Tavira was responsible for designing framing plans for MLAW clients. This position gave Defendant Tavira access to MLAW Client plans, MLAW master plans, and MLAW proprietary tools, processes and trade secrets.

93.     To perform the functions of his role, Defendant Tavira attended MLAW engineering meetings; visited with MLAW clients, either in person or via telephone; and engaged in significant design, work. Defendant Tavira also assisted other MLAW employees and partners with MLAW existing clients.

94.     To enable Defendant Tavira to effectively perform these essential functions of his role, MLAW afforded him access to a wealth of MLAW's Confidential Information as described above. MLAW also issued Defendant Tavira a secure, password-protected computer as a means to access this Confidential Information, which is securely stored on MLAW's systems and not otherwise accessible by proper means.

95.     To protect and ensure the continued secrecy and value of its Confidential Information, as a condition of his employment, MLAW required Defendant Tavira to review and acknowledge receipt of MLAW's Company Handbook.

96.     On February 12, 2015, Defendant Tavira acknowledged receiving the MLAW Company Handbook which contained policies governing his employment with MLAW. The MLAW Company Handbook Defendant Tavira acknowledged receiving contained some form of the following provisions:

- "Employees are prohibited from the unauthorized use of the passwords and encryption keys of other employees to gain access to the other employee's email messages."

- "Employees are  .  .  . prohibited from unauthorized copying or transmission of copyrighted files . . ."

- "Your time outside office hours is your own. However, you may not undertake work which may be in competition or conflict with this Company or which may interfere with the proper execution of your responsibilities. Anyone working for this firm should not work for another engineering or architectural firm, government office, or contractor."

A true and correct copy of Defendant Tavira's Handbook Receipt Acknowledgment is attached as **Exhibit 14**.

97.     Additionally, and in furtherance of protecting and ensuring the continued secrecy and value of its Confidential Information, as a condition of his employment, MLAW required Defendant Tavira to execute an employment agreement which contained, among other things, a

covenant not to compete with MLAW for a period of twelve (12) months following separation from MLAW. The restrictive covenant was reasonable, necessary, and limited in scope to protect MLAW's legitimate business interest. A true and correct copy of Defendant Tavira's February 12, 2012, Employment Agreement is attached as **Exhibit 15**.

98.     Defendant Tavira's promises to protect MLAW's Confidential Information and to not compete against MLAW for one year post-separation were essential conditions to MLAW offering him employment, and sharing with him the Confidential Information he needed to perform his job at MLAW.

## M.     Efren Tavira Suddenly Resigns from MLAW and Begins Engaging in Unlawful Conduct That Violates His Agreement with and Legal Duties to MLAW.

99.     On February 13, 2017, Defendant Tavira suddenly resigned from MLAW.

100.     Upon information and belief, Defendant Tavira promptly began working for Copeland Engineering performing duties identical to those performed at MLAW and in direct violation of the restrictive covenants to which he promised to abide in his MLAW employment agreement.

101.     Additionally, a post-separation investigation by MLAW revealed that, in the days leading up to his resignation, Defendant Tavira was extremely busy secretly gathering MLAW's Confidential Information and internal documents. Specifically, forensic reviews of Defendant Tavira's MLAW-issued computer and secure user profile showed that from about February 22, 2016, up to his departure date, he downloaded proprietary and confidential files to external USB devices and/or external cloud-based storage locations.

102.     These proprietary and confidential files constituted a significant portion of MLAW's internal records, including but not limited to: MLAW client plans, MLAW master plans, MLAW tools, and MLAW internal process documents. Defendant Tavira never sought

permission from anyone at MLAW to engage in this conduct, and never would have been granted permission to do so had he asked.

**N.      MLAW Learns That Equipment Has Been Stolen By Former Employees and Uncovers Other Misappropriation.**

103.    As described above, Defendant Copeland resigned on March 4, 2016, and in quick succession, several other named Defendants resigned to begin working at Copeland Engineering: Defendant Weaver resigned on April 1, 2016; Defendant Gaston resigned on April 15, 2016, and Defendant Treuhardt resigned on May 20, 2016. Unbeknownst to MLAW at the time, each Defendant actively, purposefully, and in direct contravention of their legal and fiduciary obligations to MLAW, stole proprietary and confidential MLAW information and trade secrets for use at Copeland Engineering.

104.    In or about October 2016, MLAW received a call from Technidea Corporation in Escondido, California ("Technidea") regarding the finalized repair of a Zip Level—a high-precision altimeter device used for engineering measurements. Zip Levels cost, on average, approximately $1,000. Technidea contacted MLAW because it had received for repair from Defendant Weaver—now at Copeland Engineering—a Zip Level that Technidea knew had been owned by MLAW. Technidea sought confirmation from MLAW that MLAW had sold or otherwise transferred the Zip Level to Copeland Engineering. But for Technidea's call, MLAW would not have learned that Defendants had unlawfully and without authority taken MLAW equipment for use at Copeland Engineering. MLAW requested that Technidea return the stolen item to MLAW. Neither Defendant Weaver nor anyone else at Copeland Engineering ever contacted MLAW seeking return of the Zip Level; an indication that Defendants were well aware that they had no authorization to take and use MLAW engineering equipment at their competing company.

105.   Upon learning that Copeland Engineering was using an expensive piece of misappropriated MLAW equipment, MLAW began a broad investigation to determine whether any of the named Defendants had engaged in any other nefarious activity without MLAW's knowledge. This investigation took time because MLAW was simultaneously working to maintain its operations after the significant loss of human capital to Copeland Engineering. Slowing the process further, in the midst of MLAW's internal investigation Defendants Chaparro and Tavira resigned. As noted above, additional post-separation investigations of each of those Defendants revealed further misappropriation of MLAW Confidential Information.

106.   In the weeks and months following each individual Defendants' resignation, it became clear that each named Defendant had misappropriated MLAW Confidential Information and has been, and intends to continue, directly and indirectly soliciting MLAW clients to take them away from MLAW. Worse, MLAW has discovered that Defendant Copeland and the other individually named Defendants are using or are attempting to use MLAW's Confidential Information to do so. Internal investigation also suggests that Defendant Copeland and the other individually named Defendants may have removed, deleted, or destroyed documents and data from MLAW devices, e-mail accounts, and hardcopy files in an attempt to conceal their disloyal, unlawful conduct.

107.   This conduct makes abundantly clear that Defendants used their employment with MLAW for one reason: to access MLAW's Confidential Information by false pretenses, and then to misappropriate that Confidential Information and use that valuable and highly secret data to raid MLAW's client base and attempt to cripple MLAW's business operations. MLAW is left with no choice but to protect its legitimate business interests through this action.

### IV.   CAUSES OF ACTION

**Count I – Misappropriation of Trade Secrets in Violation of the Texas Uniform Trade
Secret Act, TEX. CIV. PRAC. & REM. CODE § 134A.001 *et seq.*
(All Defendants)**

108.    MLAW hereby alleges and incorporates by reference each and every one of the

preceding paragraphs of this Complaint as if they were set forth fully herein.

109.    Defendants prohibited and improper use and disclosure of MLAW's Confidential

Information, including but not limited to MLAW's secret and non-publicly-available information

regarding its client lists and data, marketing strategies and data, proposals and drafts thereof,

design and engineering plans, and other confidential information for MLAW's current and

potential clients, constitutes a violation of the Texas Uniform Trade Secrets Act, TEX. CIV. PRAC.

& REM. CODE § 134A.001 *et seq.*

110.    As set forth in detail above, MLAW's client lists and data, marketing strategies

and data, proposals and drafts thereof, design and engineering plans, and other confidential

information for MLAW's current and potential clients, among other Confidential Information,

constitute protected trade secrets. This information was compiled by MLAW over many years

and at great expense. MLAW undertakes great efforts to ensure that its Confidential Information

is kept secret, is not generally known or available to the public, and is not readily ascertainable

by proper means. Among the steps taken by MLAW to protect its Confidential Information are

requiring its employees to execute and comply with the promises contained in MLAW's

Handbook, employment agreements, and/or non-disclosure agreements; storing Confidential

information in password-protected and access-restricted computer systems; and sharing such

Confidential Information only to the limited extent necessary for employees like the named

Defendants to perform their essential job functions. MLAW's Confidential Information provides

the company with a competitive advantage in the marketplace, and is not ascertainable by proper means by others who might use it to such an advantage.

111.     Defendants acquired knowledge of MLAW's Confidential Information solely through their capacity as MLAW employees, for the sole purpose of performing their duties as MLAW employees on MLAW's behalf. Defendants thus owed (and continue to owe) MLAW a duty to maintain the secrecy of such information. Additionally, as set forth above, Defendants were contractually and legally obligated to maintain the confidentiality of all of MLAW's Confidential Information. When Defendants surreptitiously made off with MLAW's Confidential Information as detailed above, and then went to work soliciting MLAW's clients for MLAW's competitor Copeland Engineering, they did so in breach of their duties to MLAW.

112.     Defendants used and continue to use MLAW's trade secrets to unfairly compete with MLAW, with full knowledge that the disclosure of such information by Defendants was and is in breach of their legal duties to MLAW.

113.     For these reasons, Defendants have violated the Texas Uniform Trade Secrets Act. As a direct and proximate result of Defendants' willful and unlawful misappropriation, disclosure, and use of MLAW's trade secrets, MLAW has suffered and will continue to suffer substantial harm. In addition to the monetary damages already sustained by MLAW, MLAW has been and continues to be irreparably damaged in the form of lost clients and goodwill, and a deteriorating position in the marketplace, for all of which there is no adequate remedy at law. Defendants have been unjustly enriched as a result of their unlawful conduct.

### Count II – Violation of Defend Trade Secrets Act of 2016, 18 U.S.C. 1831 *et seq.* (All Defendants)

114.     MLAW hereby alleges and incorporates by reference each and every one of the preceding paragraphs of this Verified Complaint as if they were set forth fully herein.

115.    The Confidential Information taken by Defendants from MLAW, as described above, constitutes trade secrets related to products and services that are used in, or intended for use in, foreign and interstate commerce. Such trade secrets are owned by MLAW.

116.    As described above, Defendants stole, appropriated, and carried away, and copied, downloaded, replicated, transmitted, sent, mailed, or communicated MLAW's trade secret information, all without MLAW's authorization, and attempted to conceal their having done so.

117.    Defendants' actions outlined above constitute a violation of 18 USC §1832 *et seq*.

118.    Defendants' misappropriation of MLAW's trade secrets was willful and malicious.

119.    Defendants have not returned and continue to possess MLAW's trade secrets and Confidential Information.

120.    MLAW has suffered and will continue to suffer immediate and irreparable injury so long as Defendants remain in possession of its trade secrets and Confidential Information.

**Count III – Violations of Racketeer Influenced and Corrupt Organizations (RICO) Act, 18 U.S.C. § 1961, *et seq*.**
**(All Defendants)**

121.    MLAW hereby alleges and incorporates by reference each and every one of the preceding paragraphs of this Verified Complaint as if they were set forth fully herein.

122.    Copeland Engineering is an enterprise engaged in and whose activities affect interstate commerce. The individually named Defendants are employed by or associated with Copeland Engineering.

123.    Defendants agreed to and did conduct and participate in the conduct of Copeland Engineering's affairs through a pattern of racketeering activity and for the unlawful purpose of

intentionally defrauding MLAW. Specifically, as outlined above, each individual Defendant intentionally, maliciously, and with utter disregard for his or her legal and ethical obligations to MLAW accessed, downloaded, or otherwise removed from MLAW's secure systems MLAW's Confidential Information and unlawfully used and continue to use such information for the benefit of themselves and of Copeland Engineering.

124.   Moreover, Copeland Engineering and Defendant Copeland individually engaged in a pattern of racketeering activity by regularly encouraging, soliciting, or even urging then-MLAW-employees to join Copeland Engineering and to unlawfully take MLAW trade secrets on their way out the door.

125.   Defendants have used and invested income from Copeland Engineering, income that was derived from Defendants' pattern of racketeering activity by improperly soliciting away MLAW clients to Copeland Engineering and using MLAW's stolen Confidential Information to service those clients.

126.   Defendants' various acts of improperly accessing, downloading, copying, and using MLAW's Confidential Information as described above constitute a pattern of racketeering activity pursuant to 18 U.S.C. § 1961(5). And Defendants have directly and indirectly conducted and participated in the conduct of Copeland Engineering's affairs through the pattern of racketeering and activity described above, in violation of 18 U.S.C. § 1962(c).

127.   Defendants have: intentionally conspired and agreed to directly and indirectly use or invest income that is derived from a pattern of racketeering activity in Copeland Engineering; acquired or maintained interests in Copeland Engineering through a pattern of racketeering activity; and conducted and participated in the conduct of the affairs of Copeland Engineering through a pattern of racketeering activity. Defendants knew that their predicate acts of stealing

MLAW's Confidential Information were part of a pattern of racketeering activity and agreed to the commission of those acts to further the schemes described above. That conduct constitutes a conspiracy to violate 18 U.S.C. §§ 1962(a), (b) and (c), in violation of 18 U.S.C. § 1962(d).

128.    Defendants knew that the Confidential Information stolen from MLAW had economic value to MLAW as it was not readily ascertainable by competitors in the market and MLAW had taken steps to keep such Confidential Information secure. Defendants knew that using MLAW's valuable, proprietary information for Copeland Engineering's and their own individual purposes would dilute the information's value to MLAW and further injure MLAW's business.

129.    As a direct and proximate result of Defendants' racketeering activities and RICO Act violations, MLAW's business has been injured in that it has lost goodwill, client business, significant financial investment in human capital, and its proprietary Confidential Information.

130.    MLAW has suffered and will continue to suffer immediate and irreparable injury so long as Defendants remain in possession of and continue to use its trade secrets and Confidential Information.

### Count IV – Violations of Computer Fraud and Abuse Act, 18 U.S.C. § 1030
### (All Defendants)

131.    MLAW hereby alleges and incorporates by reference each and every one of the preceding paragraphs of this Verified Complaint as if they were set forth fully herein.

132.    Defendants' actions described above violate both 18 U.S.C. § 1030(a)(4) and 18 U.S.C. § 1030(a)(5).

133.    MLAW's computers, computer storage systems, and computer network constitute "protected computers" under federal law, because they were used to conduct interstate and foreign commerce and communication.

134.     Defendants knowingly, and with intent to defraud MLAW, exceeded their authorized access by sending MLAW Confidential Information to their personal email addresses, downloading MLAW's Confidential Information to external physical and cloud-based storage devices, or otherwise removing MLAW Confidential Information from MLAW's protected computers all without requesting or obtaining MLAW's authorization, and all in violation of their contractual and legal obligations to MLAW.

135.     By accessing and removing MLAW's Confidential Information from MLAW's protected computers, with knowledge that they would be resigning from MLAW and planning to compete against MLAW on behalf of its competitor, Copeland Engineering, Defendants knowingly and with intent to defraud, accessed and took MLAW's Confidential Information without authorization. In so doing, Defendants fraudulently obtained a thing of value from MLAW. The value of the Confidential Information obtained by Defendants from MLAW far exceeds five thousand dollars ($5,000.00).

136.     Defendants' access to MLAW's Confidential Information would have been terminated immediately if MLAW had known of their intent to misappropriate MLAW's Confidential Information.

137.     Defendants used their access to personally obtain and alter MLAW's information in MLAW's computer network that Defendants were not entitled to obtain or alter.

138.     Defendants' intentional misconduct alleged above has, intentionally or recklessly, caused MLAW to suffer loss.

### Count V – Breach of Fiduciary Duty
**(Defendants Christopher Copeland, Weaver, Gaston, Treuhardt, Chaparro, and Tavira)**

139.     MLAW hereby alleges and incorporates by reference each and every one of the preceding paragraphs of this Verified Complaint as if they were set forth fully herein.

140.     Defendants owed a fiduciary duty to MLAW to maintain the confidentiality of MLAW's Confidential Information, and to use that Confidential Information solely in furtherance of MLAW's business interests.

141.     Defendants breached their fiduciary duties by stealing MLAW's Confidential Information for their own personal use and, by doing so, used their position at MLAW in an effort to gain business opportunities that belonged to MLAW, including providing direct assistance to one of MLAW's competitors, for their own benefit, while still a MLAW employee.

142.     As a result of Defendants' breaches of their fiduciary duties, MLAW has suffered and continues to suffer damages.

## Count VI – Breach of Contract
### (Defendants Christopher Copeland, Weaver, Gaston, Treuhardt, Chaparro, and Tavira)

143.     MLAW hereby alleges and incorporates by reference each and every one of the preceding paragraphs of this Verified Complaint as if they were set forth fully herein.

144.     The Non-Disclosure Agreement between Defendant Copeland and MLAW is a valid and enforceable contract, under which MLAW performed all of its obligations to Defendant Copeland.

145.     The Non-Disclosure Agreement between Defendant Weaver and MLAW is a valid and enforceable contract, under which MLAW performed all of its obligations to Defendant Weaver.

146.     The Educational Aid Agreement between Defendant Gaston and MLAW is a valid and enforceable contract, under which MLAW performed all of its obligations to Defendant Gaston.

147.    The Educational Aid Agreement between Defendant Treuhardt and MLAW is a valid and enforceable contract, under which MLAW performed all of its obligations to Defendant Treuhardt.

148.    The Employment Agreement between Defendant Chaparro and MLAW is a valid and enforceable contract, under which MLAW performed all of its obligations to Defendant Chaparro.

149.    The Employment Agreement between Defendant Tavira and MLAW is a valid and enforceable contract, under which MLAW performed all of its obligations to Defendant Tavira.

150.    As set forth above, each Defendant breached his obligations to MLAW under his respective applicable and valid contract.

151.    As a result of Defendants' breaches of their obligations to MLAW, MLAW has suffered, and will continue to suffer, damages.

### Count VII – Quantum Meruit/Unjust Enrichment
### (Defendants Gaston and Treuhardt)

152.    MLAW hereby alleges and incorporates by reference each and every one of the preceding paragraphs of this Verified Complaint as if they were set forth fully herein.

153.    Defendants individually and jointly received from MLAW, and accepted the benefit of, education reimbursement and hourly compensation for attending school classes and studying.

154.    The manner by which Defendants acquired the education reimbursement from MLAW was such that Defendants were reasonably notified that MLAW expected their continued loyalty and employment or else timely and proper reimbursement of those education expenses.

**155.** Defendants failed to continue their employment for the promised length of time and have not compensated MLAW for the educational benefits they received.

**156.** Defendants benefited from and were unjustly enriched by their receipt of the educational reimbursements provided by MLAW.

## V.   REQUEST FOR INJUNCTIVE RELIEF

**157.** MLAW hereby alleges and incorporates by reference each and every one of the preceding paragraphs of this Verified Complaint as if they were set forth fully herein.

**158.** Unless Defendants are enjoined from engaging in additional misconduct, MLAW will be irreparably harmed in the marketplace by having its Confidential Information improperly, unlawfully, and competitively used against it and by loss of client goodwill. Moreover, given Defendants' intentional wiping of MLAW devices and removal of hardcopy data in an attempt to conceal their unlawful activity, Defendants must be enjoined from engaging in additional intentional evidence destruction.

**159.** Such misconduct by Defendants will result in substantial loss, which is unascertainable at this point in time, and future economic loss which presently is incalculable.

**160.** MLAW has no adequate remedy at law for Defendants' misconduct, as money damages are not adequate to compensate for the ongoing harm caused by their misconduct.

**161.** MLAW has a clear legal right to the requested relief.

**162.** The public interest favors entry of an injunction to uphold the sanctity of contract, trade secret preservation, and to protect the legitimate business interests of parties who have substantial relationships with clients.

## VI.   ATTORNEYS' FEES

**163.** Pursuant to TEX. CIV. PRAC. & REM. CODE § 38.001(8), MLAW is entitled to recover, and hereby pleads the Court for an award of, its reasonable and necessary attorneys'

fees in connection with Defendants breaches of their obligations to MLAW under the relevant and applicable non-disclosure agreements, employment agreements, and educational reimbursement agreements.

164.    Pursuant to TEX. CIV. PRAC. & REM. CODE § 134A.005, MLAW is entitled to recover, and hereby pleads the Court for an award of, its reasonable and necessary attorneys' fees in connection with Defendants' misappropriation of MLAW's Confidential Information.

165.    Pursuant to 18 U.S.C. § 1836(b)(3)(D) and 18 U.S.C. § 1964(c), MLAW is entitled to recover, and hereby pleads the Court for an award of, its reasonable and necessary attorneys' fees in connection with Defendants' willful and malicious misappropriation of its Confidential Information and RICO Act violations.

## VII.    EXEMPLARY DAMAGES

166.    MLAW seeks an award of exemplary damages under TEX. CIV. PRAC. & REM. CODE § 41.003, because MLAW's damages resulted from Defendants' fraud and/or malice.

167.    MLAW further seeks an award of exemplary damages pursuant to TEX. CIV. PRAC. & REM. CODE  § 134A.004(B) due to Defendants' willful and malicious misappropriation of MLAW's Confidential Information.

168.    MLAW further seeks an award of exemplary damages pursuant to 18 U.S.C. § 1836(b)(3)(C) and 18 U.S.C. § 1964(c) due to Defendants' willful and malicious misappropriation of its Confidential Information and RICO Act violations.

## PRAYER FOR RELIEF

A.    An order preliminarily requiring Defendants to preserve all information currently stored on their computers and electronic devices, and including any information stored on backup tapes that may relate in any way to the issues raised in this Complaint;

B.     An order granting MLAW the right to conduct, through reputable experts in the information technology field, an immediate inspection of Defendants' personal electronic mail accounts, computers, and other electronic devices. As part of this inspection, MLAW proposes that its expert be permitted to copy the hard drives of Defendants' computers, copy any data on Defendants' home network, and analyze the data collected to determine if they presently or ever have contained MLAW's trade secrets and/or Confidential Information. MLAW's expert shall also be provided all passwords and information needed to gain access to, copy, and analyze Defendants' personal electronic mail accounts including any email account Defendants used to email themselves MLAW documents. As soon as this analysis is complete, counsel for MLAW will promptly report the results of this inspection to the Court. None of the information copied will be used by MLAW, unless permitted by an order of this Court;

C.     An order preliminarily, then permanently, requiring that Defendants:

    1)     Comply with their obligations under the MLAW Handbook and each Defendants' respective employment agreement, non-disclosure agreement, and/or educational reimbursement agreement;

    2)     Return to MLAW all of its trade secrets and other Confidential Information including, but not limited to, any information copied from MLAW computers or computer networks and any documents or other MLAW property physically copied, in any medium, or removed from MLAW's offices by Defendants or any other former or current MLAW employee;

    3)     Identify all persons to whom MLAW's trade secrets and other Confidential Information have been disclosed;

4)      Refrain from using any MLAW trade secrets or Confidential Information and from selling any products or services based thereon, regardless of whether the trade secret or Confidential Information is embodied only in a component part of a larger product, or the product is produced through the trade secret or Confidential Information;

5)      Refrain from using MLAW trade secrets or Confidential Information to conduct business with any party who was a client or prospective client of MLAW during the period when Defendants were employed with MLAW;

6)      Refrain from using MLAW's trade secrets or Confidential information to solicit MLAW's vendors, suppliers, licensors, or other business relations to divert, take away, or interfere with MLAW's relationship with them;

7)      Refrain from soliciting MLAW's current employees to leave MLAW;

D.      Grant MLAW's request for expedited discovery, filed concurrently with this complaint;

E.      Order Defendants to provide to MLAW with the originals and all copies of any and all MLAW documents and information, whether on paper or in computer memory, file, or external storage media, and/or order any other and further equitable relief that will have the effect of "undoing" any past or current misappropriation of MLAW's trade secrets by Defendants, and by any entity(ies) acting in concert with Defendants;

F.      Enter a judgment against Defendants on each count of this Complaint;

G.      Award MLAW its actual, consequential, and double and/or treble exemplary damages as provided for under the DTSA and RICO Act;

H.      Award MLAW its reasonable and necessary attorneys' fees incurred in or related to this action;

I.      Award MLAW pre- and post-judgment interest at the highest rate allowable by law;

J.      Award MLAW its costs of court; and

K.      Grant MLAW all such further and additional relief to which it may be entitled.

Dated:  September 20, 2017                    Respectfully submitted,

                                             */s/ Erik G. Moskowitz*
                                             Erik G. Moskowitz
                                             Texas Bar No. 24089904
                                             Matthew Murrell
                                             Texas Bar No. 24083545
                                             REED & SCARDINO LLP
                                             301 Congress Avenue, Suite 1250
                                             Austin, Texas  78701
                                             (512) 474-2449
                                             (512) 474-2622 (facsimile)
                                             emoskowitz@reedscardino.com
                                             mmurrell@reedscardino.com

                                             **ATTORNEYS FOR PLAINTIFF
                                             MEYER, LYTTON, ALLEN,
                                             WHITAKER, INC. D/B/A MLAW
                                             ENGINEERS**

## VERIFICATION

| | |
|---|---|
| STATE OF TEXAS | § |
| | § |
| COUNTY OF TRAVIS | § |

The undersigned, James C. Conner, President, CEO, and Chairman of Meyer, Lytton, Allen, Whitaker, Inc. d/b/a MLAW Engineers ("MLAW"), being duly sworn on his oath, does hereby state as follows: "My name is James C. Conner. I am over the age of 18 years old, of sound mind, and fully qualified to make this verification. I have read the foregoing *Plaintiff's Original Verified Complaint and Request for Injunctive Relief,* and I declare under penalty of perjury that the facts contained within that pleading are true and correct."

Executed on this 14 day of September 2017.

By: _____
    James C. Conner